IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ERIC LARSON,[1] | § | No. 344, 2024 |
| | § | |
| Respondent/Petitioner Below, | § | Court Below—Family Court |
| Appellant, | § | of the State of Delaware |
| | § | |
| v. | § | File No. CN23-01005 |
| | § | |
| CINDY GIBSON, | § | Petition Nos. 23-00029 |
| | § | 23-07261 |
| Petitioner/Respondent Below, | § | |
| Appellee. | § | |

Submitted: March 28, 2025
Decided: June 2, 2025

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

## <u>ORDER</u>

After consideration of the parties' briefs and the record below, it appears to the Court that:

(1)     This action began when the appellee, "Cindy Gibson," filed a petition for an order of protection from abuse against the appellant, "Eric Larson," on January 3, 2023.  Several months later, Mr. Larson filed a petition for an order of protection from abuse against Ms. Gibson.  The petitions were tried together before a Family Court commissioner.  The commissioner granted Ms. Gibson's petition and denied Mr. Larson's petition.  After remanding to the commissioner for consideration of

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

certain evidence that the commissioner had ruled inadmissible, a Family Court judge affirmed the commissioner's decision. For the reasons discussed below, we affirm the Family Court's decision.

*The Allegations of Abuse*

(2)    Ms. Gibson's petition alleged that Ms. Gibson and Mr. Larson had a consensual sexual relationship while working together at a Wilmington law firm (the "Firm"). According to the petition, over the course of a few months in the fall of 2022, Mr. Larson wanted to "escalate" the relationship and Ms. Gibson wanted to back away from the relationship. Mr. Larson became increasingly angry and retaliated against Ms. Gibson at work or threatened to do so.

(3)    Ms. Gibson alleged that Ms. Gibson, Mr. Larson, and other friends from work made plans to go out for dinner and drinks in Philadelphia on the evening of Friday December 16, 2022. Mr. Larson asked Ms. Gibson a number of times if she would go home with him at the end of the night. He lived in Conshohocken, Pennsylvania. She told him no and that she planned to take an Uber home with one of the friends (the "Friend"), who also worked at the Firm and lived in the same building as Ms. Gibson in Wilmington. In Philadelphia, the group went to dinner, then a bar, then a club. At the club, Ms. Gibson tried to avoid Mr. Larson several times, but he continued to follow her. Eventually, she left the club "to escape him." In response to several text messages from Mr. Larson asking where she was, Ms.

Gibson called and told him that she was going to call an Uber to take her home. Mr. Larson then approached Ms. Gibson outside and tried to convince her to let him take her home. Some of their friends gathered around; Ms. Gibson told them and Mr. Larson that she wanted to take an Uber home alone and began walking away.

(4) Mr. Larson followed her, telling their colleagues that they could leave.

The petition further alleged:

I repeatedly asked [Mr. Larson] to leave me alone, and to stop following me. I told [him] I wanted to go home alone and I would not get into his car with him. He grabbed me several times to try to get me to stop walking, and continued telling me to stop, and to just get in his car with him. I began walking towards city hall because it is a landmark in the city that I am familiar with. I wanted to stop to call an Uber, but I also did not want to stop walking out of fear that [Mr. Larson] would grab me and force me to come with him to his car.

At some point during the walk, [Friend] texted me to ask where I was. I told [her] that I was trying to get away from [Mr. Larson], and that he was following me. [Friend] told me that she and my other friends would pick me up and to her send her my location. I told her I was at city hall.

I continued asking [Mr. Larson] to please stop following me and stop trying to grab me. When it became clear that [he] would not stop, I became increasingly afraid. I began to run away from [him], and he began chasing me. At some point during this, he stopped chasing me and laid down on the ground and yelled at me to call an ambulance because he was hurt and it was my fault. I attempted to flag down some police that were across the street, but they did not respond to me so I began calling 911. As soon as I did, I turned around and saw that [Mr. Larson] had gotten up, so I ended the call and began running again.

At this point I was beginning to feel an oncoming panic attack, and I continued dodging his attempts to grab me. My friends arrived and one of them hugged me and walked me a few feet away. I had begun to have a full blown panic attack and was sobbing with my hands over my ears, one of my friends guided my head between my knees to

3

calm me down. I stayed like that for what felt like several minutes before my friends helped me in their car and drove me home.

When I got home late that night, I had a message from him demanding to know what happened, so I called him. [He] yelled at me, alleging that [Friend] had assaulted him while she was trying to get him away from me. I told him I did not see that happen, as I was having a panic attack and my head was between my knees. I was crying during this call. I asked [him] why he was chasing me when I already told him I did not want to go home with him, and why he would not just leave me alone when I asked. [He] told me that he was keeping me "safe" and that he could not let me walk around the city at night dressed in a short skirt.

On this call, [Mr. Larson] demanded that I "make things right" and that I send a text to all of our friends who were there, telling them that I was not afraid of him, and that I saw [Friend] attack him and it was unprovoked and unjustified; he said that if I did not do all of these things, he would file a police report against [Friend] for assault. I reiterated that I did not see the interaction between him and [Friend]. I explained that I was afraid of him, and I was afraid of him getting me into his car and taking me to his home because I knew he would want to engage in sexual activity, as he has in the past. I told [him] I did not feel safe that he would respect it when I told him "no" as he has done so in the past. I was referencing an argument we had the night before where I told him that I feel he is extremely sexually coercive, and does not always listen when I tell him "no" or ask him not to do certain things that make me uncomfortable. [Mr. Larson] got upset with me and said that I was calling him a "rapist" and that he should get "points" for the occasional times when he does stop when I ask him to. I fell asleep on the phone at some point during this conversation.

(5)     Ms. Gibson's petition alleged that the parties continued their discussions about the Philadelphia events the next day. Mr. Larson "continuously berated" Ms. Gibson "for not going home with him the night before and for making [Friend] and my other friends believe I was in danger." He "reiterated that I had to 'fix it' and said that he would no longer talk about it on the phone, only in person."

4

Mr. Larson threatened to put Ms. Gibson's job at the Firm at risk and to "go after" Friend if Ms. Gibson did not "fix it" and keep him happy. Ms. Gibson agreed to meet in person, rather than continuing the discussions on the phone, in an attempt to pacify him.

(6)     When Mr. Larson refused to meet at a bookstore, as Ms. Gibson suggested, she went to his home. He continued his threats toward Ms. Gibson's job and Friend. Mr. Larson "eventually grew calmer and told [Ms. Gibson] that if [she] proved to him that [she] would compromise and care about his needs more than [hers], that he would not follow through with all of his aforementioned threats." He said he was very upset and "needed sex to calm down." She said "no," that she was not comfortable with that, and did not want to have sex with him. He became upset again, saying that she was making him feel rejected. He "began badgering [her] to give in, reiterating that it was the only way to show him that [she] care[d] about him and then maybe he would not tell my job that we were in a relationship, or cause me to have to report the police activity to the bar." Ms. Gibson began to have a panic attack and moved to sit on the bathroom floor with the shower running, which was an activity that had previously soothed her when she had a panic attack. The petition alleged that Mr. Larson followed her into the bathroom and then, after she told him "no" and tried to pull away, he forced her to perform oral sex. After insisting that she lay with him for a few minutes, Mr. Larson followed Ms. Gibson downstairs,

5

telling her that he expected her to text their friends that night or there would be "consequences." The petition alleged that Ms. Gibson cut off contact with Mr. Larson after the bathroom incident, reported him to the Firm on December 18, 2022, and reported him to police on December 22, 2022. She filed the PFA petition on January 3, 2023.

(7) On April 12, 2023, Mr. Larson filed a petition for an order of protection from abuse against Ms. Gibson. Mr. Larson alleged that, during the parties' relationship, Ms. Gibson "constantly carried a knife" and threatened Mr. Larson with it. She also "would take items from [his] home after searching without permission." Mr. Larson alleged that Ms. Gibson struck him in the face and "smacked and scratched [him] in unwanted ways on many occasions;" threatened to have her father shoot him; took unwanted photos of Mr. Larson and threatened to use them at work; and attempted to force Mr. Larson to engage in unwanted sexual acts by refusing to speak to him and threatening to "leave [him" or "get [him] into trouble" if he did not comply. He alleged that he had told her he felt sexually coerced, after which Ms. Gibson allegedly sent him an article about sexual coercion and said he was "stupid" and did not know what coercion meant and that if he wanted to know, he could start by reading the articles she sent him. The petition alleged that Ms. Gibson insulted Mr. Larson's level of reading comprehension and bought him a grammar book, telling him that he should learn to speak properly if he wanted to meet her family.

(8)    A Family Court commissioner presided over a four-day trial on the petitions in April and May of 2023. The witnesses included Ms. Gibson; Mr. Larson; the Friend; other colleagues, including several who were in Philadelphia on the night at issue; and Cynthia Stettner, a forensic nurse examiner and certified legal nurse consultant whom Mr. Larson called as an expert witness. The evidence also included video footage from surveillance cameras in Philadelphia and a camera inside Mr. Larson's home, messages between the parties and others, and hundreds of pages of text messages between Ms. Gibson and Mr. Larson.

(9)    On June 13, 2023, the Family Court commissioner granted Ms. Gibson's petition, entering a two-year PFA order against Mr. Larson, and denied Mr. Larson's petition. The commissioner issued a fifty-two-page decision explaining his reasoning on August 31, 2023 (the "Post-Trial Decision"). The Post-Trial Decision first addressed Mr. Larson's motion to dismiss, in which Mr. Larson argued that the court lacked jurisdiction because he and Ms. Gibson were not in a "substantive dating relationship" within the meaning of the PFA statute.[2] The

---

[2] *See* 10 *Del. C.* § 1041(2) (effective July 28, 2015 to June 26, 2023) (defining "domestic violence" as "abuse perpetrated by 1 member against another member of" specified "protected classes," including "persons in a current or former substantive dating relationship"). This order refers to the version of the statute in effect in December 2022, when the conduct at issue in this case occurred.

At a hearing on March 17, 2023, Mr. Larson's counsel made an oral motion to dismiss Ms. Gibson's PFA petition, arguing that the parties were not in a "substantive dating relationship" as provided in Section 1041. On March 28, Mr. Larson's counsel filed a written motion to dismiss

7

commissioner found that the parties engaged in a sexual relationship between June 2022 and December 2022. They spent a considerable amount of time together while studying for the July 2022 bar examination. Mr. Larson gave Ms. Gibson a key to his home and her own passcode to his alarm system, gave her permission to be there when he was not home, and stocked food that she enjoyed. They exchanged gifts. They engaged in flirtatious dialogue and sexual banter, including through text messages and social media applications, and they talked almost every day. Ms. Gibson stayed at Mr. Larson's home to take care of his dog when he was out of town; she also cared for Mr. Larson, at his request, after a medical procedure that required general anesthesia. They sought to define their relationship and discussed whether they should be exclusive or end their relationship. They broke up and then resumed their relationship multiple times. Moreover, Mr. Larson alleged in his PFA petition that the parties were in a substantive dating relationship. Based on those facts, the commissioner concluded that the parties were in a "substantive dating relationship" as provided in the statute.

(10) Addressing the allegations of abuse, the commissioner denied Mr. Larson's petition against Ms. Gibson. The commissioner found that Mr. Larson "made several claims that made the Court question his overall credibility." The

---

on that basis. Then, on April 12, while the motion to dismiss was still pending, Mr. Larson filed his PFA petition against Ms. Gibson, alleging that the parties had a "current or former substantive dating relationship."

commissioner found that the "absurdity" of Mr. Larson's claim that Ms. Gibson threatened to have her father kill him was "readily apparent." Moreover, the commissioner concluded that Mr. Larson's claim that Ms. Gibson sent him a knife emoji as a threat was "frivolous and not supported by the weight of the evidence." The commissioner observed that, in 450 pages of texts between the parties, Ms. Gibson used the knife emoji twice and that, in the context in which it was used, "[a]ny reasonable person would understand it" to have been "flirtatious banter with pure sarcasm" and not a threat.

(11) The commissioner granted Ms. Gibson's petition, finding that Mr. Larson violated 10 *Del. C.* § 1041(1)(b), (d), and (h).[3] Based on the testimony of the various witnesses, and emphasizing the video evidence, the commissioner found that Mr. Larson followed Ms. Gibson as she walked away in Philadelphia, then faked an illness in an effort to "take advantage of Ms. [Gibson's] sympathy." As Ms. Gibson attempted to call 911 and seek assistance from nearby police officers, Mr. Larson snuck away. Then, as Ms. Gibson resumed walking, Mr. Larson followed her again and chased her as she began running away. The commissioner determined that Mr. Larson then approached Ms. Gibson again, who backed away and then

---

[3] 10 *Del. C.* § 1041(1) (defining "abuse" as "conduct which constitutes the following: . . . (b) Intentionally or recklessly placing or attempting to place another person in reasonable apprehension of physical injury or sexual offense to such person or another; . . . (d) Engaging in a course of alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response; . . . or (h) Any other conduct which a reasonable person under the circumstances would find threatening or harmful").

began running away, and Mr. Larson chased her a second time. The commissioner concluded that Ms. Gibson's "emotional distress was apparent that night, as multiple witnesses described her condition after the chase," including that she was on the ground with her knees curled up toward her chest, shaking, crying, having trouble breathing, and appeared to be having a panic attack. The commissioner concluded that Mr. Larson "chased Ms. [Gibson] twice and that his actions during both chases" constituted abuse under subsections (b), (d), and (h) of Section 1041(1).

(12) The commissioner also found that Mr. Larson coerced Ms. Gibson into performing oral sex at his home on Saturday December 17, 2022, the day after the incident in Philadelphia, by threatening to (i) file criminal charges against Friend, (ii) report Friend to bar authorities, and (iii) expose their relationship to coworkers, peers, and Ms. Gibson's mentor at work. The commissioner further found that Mr. Larson pressured Ms. Gibson to text the group and execute an affidavit changing her story and then, after the oral sex, gave her a deadline to accede to his demands. The commissioner compared Mr. Larson's conduct to sexual extortion under the Delaware criminal code, and concluded that Mr. Larson's conduct on December 17, 2022, constituted acts of abuse under subsections (b), (d), and (h) of Section 1041(1).

(13)   Mr. Larson sought review of the commissioner's decision.[4]  The Family Court judge reviewed the matter *de novo* and addressed Mr. Larson's objections in a decision dated December 13, 2023 (the "First ROCO Decision").  The judge rejected most of Mr. Larson's claims of error and found that the record supported the commissioner's finding, by a preponderance of the evidence,[5] that Mr. Larson committed an act of abuse against Ms. Gibson.  But the judge determined that the PFA order should not have included language that explicitly prohibited Mr. Larson from being on the Firm's premises (in contrast to prohibiting Mr. Larson from being near Ms. Gibson's place of work), concluding that such relief is not available under the PFA statute.  The judge also determined that the commissioner should not have considered an unsolicited communication from the Firm's general counsel but that no further relief was warranted based on that issue.

(14)   The judge also addressed the admissibility of recorded conversations between the parties that Mr. Larson had sought to admit into evidence.  Mr. Larson secretly recorded the conversations in the aftermath of the Philadelphia events, when he was in Pennsylvania and Ms. Gibson was in Delaware.  The commissioner held that the recordings were inadmissible because they were made in violation of

[4] *See* Del. Fam. Ct. R. 53.1 (governing appeals from an order of a Family Court commissioner to a Family Court judge).
[5] *See* 10 *Del. C.* § 1044(b) ("If the Court finds by a preponderance of the evidence that the alleged domestic violence has occurred, . . . the Court shall grant any appropriate relief, including, but not limited to, the relief set forth in § 1045 of this title.").

Pennsylvania law, a two-party consent state. The Family Court judge determined that Delaware law applied and held that the recordings were admissible, if properly authenticated, because Delaware is a one-party consent state. The judge therefore remanded for the commissioner to hold a hearing to consider the recordings if they could be properly authenticated.

(15) On remand, the commissioner admitted the recordings into evidence and heard testimony from Mr. Larson regarding the recordings. In a written decision dated March 5, 2024 (the "Remand Decision"), the commissioner found that the recordings captured several phone calls and a FaceTime session between the parties, which Mr. Larson knew were being recorded and Ms. Gibson did not. The recordings also captured the voice of another person on Mr. Larson's end of the line, from whom Mr. Larson was taking guidance on areas of inquiry that he should pursue when talking to Ms. Gibson.[6] The commissioner determined that Ms. Gibson was in "obvious emotional distress" during the calls. The commissioner also found that Mr. Larson admitted that he chased Ms. Gibson during the panic attack and "even acknowledged in a side conversation [with the third party] that Ms. [Gibson] could even die from a panic attack" because of a chronic, serious medical condition from which she suffers. In the final recording, Mr. Larson "attempted to garner sympathy from Ms. [Gibson] about the damage done to his reputation," falsely

---

[6] Mr. Larson testified that the other voice was that of an ex-girlfriend of his.

claimed that he had been arrested during the incident in Philadelphia, and stated that the police would be calling him and he would pursue charges unless the situation were resolved to his satisfaction. At the end of the call, Ms. Gibson attempted to "placate" Mr. Larson and agreed to "fix it," and Mr. Larson demanded to know what words she would use to reframe the events of the previous night. The commissioner determined that the recordings "were not exculpatory as to Mr. [Larson]," emphasizing that Mr. Larson admitted to chasing Ms. Gibson and Ms. Gibson repeatedly stated during the calls that Mr. Larson had chased her. The commissioner concluded that the recordings "reinforce[d] the notion that Mr. [Larson] engaged in a non-consensual chase of Ms. [Gibson] and caused her to have a panic attack(s)."

(16) Mr. Larson then sought review of the Remand Decision. In a decision dated July 22, 2024 (the "Second ROCO Decision"), the Family Court judge reviewed Mr. Larson's objections to the Remand Decision under a *de novo* standard of review and concluded that the record supported the commissioner's findings that the phone calls confirmed the previous finding that Mr. Larson "engaged in a chase of Petitioner constituting abuse under the statute." Mr. Larson has appealed to this Court.

*Applicable Legal Principles*

(17) When a party timely files a request for review of a commissioner's order, a Family Court judge must conduct an independent, *de novo* review of the

13

record in order to determine whether the portions of the commissioner's order to which an objection has been raised should be accepted, rejected, or modified in whole or in part.[7] Then, on appeal to this Court from a Family Court order, our review "extends to the facts and the law as well as to the inferences and deductions made by the judge."[8] We review issues of law *de novo*.[9] If the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings to assure that they are sufficiently supported by the record and are not clearly wrong.[10]

(18) To grant a protective order after a PFA hearing, the Family Court must find by a preponderance of the evidence that the respondent has committed an act of domestic violence.[11] "'Domestic violence' means abuse perpetrated by 1 member against another member of [certain] protected classes" set forth in the statute; the protected classes include "persons in a current or former substantive dating relationship."[12] "Abuse" includes, among other conduct, "[i]ntentionally or recklessly placing or attempting to place another person in reasonable apprehension of physical injury or sexual offense to such person or another," "[e]ngaging in a

---

[7] *Stuart v. Stuart*, 159 A.3d 265, 2017 WL 1090543, at *1 (Del. Mar. 22, 2017) (TABLE).
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*; *see also* 10 *Del. C.* § 1044(b) ("If the Court finds by a preponderance of the evidence that the alleged domestic violence has occurred, . . . the Court shall grant any appropriate relief, including, but not limited to, the relief set forth in § 1045 of this title.").
[12] 10 *Del. C.* § 1041(2). Mr. Larson does not argue in this appeal that the parties' relationship was beyond the scope of the statute.

course of alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response," or "[a]ny other conduct which a reasonable person under the circumstances would find threatening or harmful."[13]  With these precepts in mind, we turn to Mr. Larson's arguments in this appeal.

*Analysis of Issues on Appeal*

(19)   In a three-page section of the opening brief that poses the question whether "the Delaware PFA statute [is] unconstitutionally vague,"[14] Mr. Larson contends that (i) the statute is void because the definition of "abuse" does not sufficiently define the prohibited conduct; (ii) the statute improperly focuses on "the subjective feelings of the petitioner" and "disregards the intent of the respondent;" and (iii) the PFA statute unconstitutionally deprives PFA respondents of their First and Second Amendment rights without requiring violent or threatening behavior or speech.[15]

---

[13] 10 *Del. C.* § 1041(1)(b), (d), (h) (effective July 28, 2015 to June 26, 2023).  These are the subsections under which the commissioner found that Mr. Larson's conduct constituted abuse.

[14] Opening Brief at 39 (question presented).  The heading of the section asserts that the "Delaware PFA statute is void for vagueness."

[15] The latter two arguments are not correctly characterized as void-for-vagueness arguments. Instead, those arguments assert that the mental state required for imposition of a PFA is too low to pass constitutional muster and that the statute punishes conduct that is insufficiently threatening to warrant a deprivation of rights.

(20)   Mr. Larson did not fairly present these arguments to the Family Court, and we find no plain error warranting their consideration now.[16] The opening brief points to four places in the record where the "void for vagueness" question purportedly was preserved.[17] In none of those portions of the record did Mr. Larson assert the constitutional challenges to the PFA statute that he now raises on appeal.[18]

(21)   The reply brief points to three additional portions of the record where Mr. Larson purportedly preserved his constitutional arguments.[19] In one, Mr. Larson claimed that the court improperly extended the *ex parte* PFA orders beyond the period permitted by statute.[20] In another, Mr. Larson asserted, in the introduction to his second request for review of the commissioner's order, that the commissioner "found a way to make vague allegations of abuse by preponderance of the

---

[16] *See* Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."); *see also, e.g.*, *Bennett v. State*, 2010 WL 987025, at *2 (Del. Mar. 18, 2010) (refusing to consider constitutional argument that was not fairly presented to the court below); *Cassidy v. Cassidy*, 689 A.2d 1182, 1184 (Del. 1997) (holding that claim that PFA statute was unconstitutionally vague was not fairly presented to the trial court and finding no plain error mandating review).

[17] Opening Brief at 39 (citing appendix at A1298, A0192, A0219, A0321).

[18] *See* Appendix to Opening Brief at A1298, A0192 (claiming that the allegations in the petition were too broad to give Mr. Gibson proper notice of the claims against him or to allow the court to determine the relevance of proffered evidence); *id.* at A219 (claiming that the *ex parte* PFA order was extended beyond the period permitted by statute); *id.* at A321 (asserting a factual argument about Mr. Larson's and Ms. Gibson's recorded conversations).

[19] Reply Brief at 16 (citing A0289–90, A0293, A0220).

[20] Appendix to Opening Brief at A0220.

evidence."[21]  Neither of those statements fairly presented to the Family Court any of the constitutional arguments that Mr. Larson now makes.

(22)  Nor did the third.  There, Mr. Larson asserted in his second ROCO request that the commissioner erroneously found that Mr. Larson engaged in coercive sexual conduct.  Mr. Larson argued that the commissioner gave insufficient weight to Mr. Larson's statements during the recorded conversations and too much weight to Ms. Gibson's trial testimony.  Mr. Larson argued:  "The Commissioner did not place any value on the intent provided by Mr. [Larson] in the recording.  Mr. [Larson's] words and intent are clear, he was anxious and expressed confusion about what had happened that night during the calls."[22]  At the second use of the word "intent," the text referred to a footnote that stated that the United States Supreme Court "explained in *Counterman v. Colorado* [that] 'the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder.'"[23]  The footnote then cited three additional United States Supreme Court decisions.  That did not fairly present to the Family Court any of the constitutional challenges that Mr. Larson now asserts.[24]  A

---

[21] *Id.* at A0289–90.

[22] *Id.* at A0292–93.

[23] Reply Brief at A0293 (citation to *Counterman v. Colorado*, 600 U.S. 66 (2023), omitted).

[24] We also note that *Counterman* is distinguishable from this case.  In that decision, the United States Supreme Court applied First Amendment jurisprudence to hold that a criminal prosecution based solely on Facebook messages that the defendant sent to the complaining witness requires proof that the defendant "had some subjective understanding of the threatening nature of his statements," that "a mental state of recklessness is sufficient," and that the state therefore was

legislative enactment is presumed to be constitutional, and the party challenging a statute's constitutionality has the burden of rebutting that presumption.[25] Mr. Larson did not satisfy that burden in the Family Court, nor has he satisfied it in this appeal.

(23) Mr. Larson argues that the commissioner erroneously considered a letter to the court from the Firm's general counsel. Although the record reflects that the parties' counsel were contemporaneously aware of the contents of the letter and appear to have been copied on it, the letter itself does not appear in the record or in Mr. Larson's appendix, so this Court cannot review the letter's contents.[26] Nor has Mr. Larson described the contents of the letter or explained how they bore on the commissioner's finding of abuse. Rather, from what we can glean from the record, the letter related to the Firm's assertion of potential privilege over a recording that Mr. Larson allegedly secretly made of a conversation he had with the Firm's general counsel.[27]

---

required to prove that the defendant "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. In contrast, the PFA against Mr. Larson was based on conduct—chasing Ms. Gibson and sexual contact—and not solely words.

[25] *McDade v. State*, 693 A.2d 1062, 1065 (Del. 1997).

[26] The record reflects that a dispute developed between the parties about the discoverability of a recording that Mr. Larson made of a conversation between himself and the Firm's general counsel and then inadvertently produced to Ms. Gibson's counsel. In conversations with the parties' counsel, the Firm's general counsel asserted potential privilege as to the recording, although the Firm did not have access to the recording. The parties submitted briefing on the discoverability of the recording. In the course of that briefing, the Firm's general counsel submitted a letter to the commissioner relating to the issue.

[27] The Firm's assertion of privilege arose in the context of a dispute between the parties about whether Ms. Gibson's counsel could review the recording or whether the recording had to be returned to Mr. Larson's counsel as an inadvertent disclosure.

(24) In the First ROCO Decision, the Family Court determined that the commissioner should not have considered the letter but stated that the court "cannot make a finding that the Commissioner's review of the communication adversely affected Respondent or formed the basis of the aforementioned relief." Having not provided a copy of the letter or even a description of the letter's contents indicating that the letter contained anything bearing on the substance of the case, Mr. Larson has not demonstrated an error that warrants reversal of the findings of abuse in the circumstances of this case.

(25) Mr. Larson asserts that the commissioner erroneously relied on a "bench card" related to coercion, strangulation, and oral sex as "substantive evidence, essentially taking judicial notice of its contents," rather than "as a guide with which to examine the expert" witness. In the First ROCO Decision, the court held that the commissioner erroneously took judicial notice of the bench card but that no relief was warranted because the commissioner did not rely on the card in making his findings of abuse.

(26) In our view, the record does not reflect that the commissioner used the bench card as "substantive evidence," and we therefore find no merit to this argument. Mr. Larson called a forensic nurse examiner and certified legal nurse consultant, Cynthia Stettner, to testify as an expert witness. Stettner opined, among other things, that (i) photographs of Ms. Gibson taken approximately three days after

19

the incident in question did not show injuries consistent with forced oral sex; and (ii) if Mr. Larson had strangled Ms. Gibson until she lost consciousness, as Ms. Gibson testified occurred in November 2022, she likely would have required medical attention. Apparently based on the contents of the bench card, the commissioner asked Stettner questions about what proportion of strangulation victims seek medical attention and whether coerced oral sex would necessarily result in physical injuries that would be captured in photographs.[28]

(27) The commissioner's questions, and Stettner's responses, regarding nonreporting of strangulation were consistent with questions and testimony that Stettner had already provided during cross-examination.[29] Moreover, the commissioner did not find that Mr. Larson strangled Ms. Gibson in November 2022. To the extent the commissioner's questions about physical injuries resulting from coercive oral sex were based on the contents of the bench card,[30] the commissioner referred to the bench card to frame questions for the expert witness, *not* as independent substantive evidence of a fact at issue in the case.[31] We find no reversible error as to the bench card issue.

---

[28] Appendix to Opening Brief at A0874-80.
[29] *Id.* at A0867-68.
[30] It is not clear from the record whether the strangulation-related questions, the coercion-related questions, or both were based on the bench card.
[31] In *Tribbitt v. Tribbitt*, 963 A.2d 1128 (Del. 2008), a "vocational expert" testified regarding a wife's earning capacity in a property division and alimony case. The witness testified that the wife could find a job earning $14 to $17 per hour. Several months after the hearing, the court conducted an internet search regarding job openings, from which the court concluded that the wife could

(28) Mr. Larson argues that the Family Court improperly extended the *ex parte* order beyond the period permitted by statute. Title 10, Section 1043 of the Delaware Code governs emergency hearings and the issuance of *ex parte* protective orders. It provides:

(a) A petitioner may request an emergency protective order by filing an affidavit or verified pleading alleging that there is an immediate and present danger of domestic violence to the petitioner or to a minor child of the petitioner or to an adult who is impaired.

(b) An emergency protective order may be issued on an ex parte basis, that is, without notice to the respondent, where the petitioner certifies in writing the efforts, if any, which have been made to give notice to the respondent or the reasons supporting the claim that notice should not be required.

(c) An emergency hearing held on an ex parte basis shall be held the same day that the petition is filed or the next day that the Court is in session. All other emergency hearings shall be scheduled for an expedited hearing within 15 calendar days after the petition is filed.

(d) In any case in which an ex parte protective order has been issued, a full hearing shall be held within 15 days. The Court may extend an ex parte order as needed, but not to exceed 30 days, to effectuate service of the order or where necessary to continue protection.

(e) If the Court finds by a preponderance of the evidence that the alleged domestic violence has occurred, or if the respondent consents to entry of a protective order, the Court shall grant any appropriate relief, including, but not limited to, the relief set forth in § 1045 of this title.

---

obtain a job earning only $10 to $13 per hour. Based on that internet search, the court attributed the wife with income of $11.50 per hour. On appeal, this Court held that the "Family Court committed reversible error when it rejected unrefuted testimony by the Husband's expert and substituted for that testimony the results of its own internet search." *Id.* at 1131. Here, in contrast, the commissioner posed questions to the expert witness based on the contents of the bench card; he did not take judicial notice of facts outside the record. *Id.* ("[W]hile a judge may take judicial notice of a fact outside the record, that fact must not be subject to reasonable dispute and the parties must be given prior notice and an opportunity to challenge judicial notice of that fact.").

(f) In those cases where the respondent is not present for the hearing, or where the hearing is held ex parte, any protective order issued shall be served immediately upon the respondent, in accordance with § 1065 of this title. A certified copy of the order shall also be given to the petitioner after the hearing, before leaving the courthouse. If the order recites that the respondent appeared in person before the Court, the necessity for further service is waived and proof of service of the order is not necessary; in those cases, the respondent shall be given a copy of the order before leaving the courthouse.[32]

Mr. Larson argues that the court erroneously extended the orders entered in this case beyond the periods permitted by Section 1043(d).

(29) Ms. Gibson filed her PFA petition and request for emergency *ex parte* relief on January 3, 2023. A Family Court commissioner issued an *ex parte* order that day. That order provided that it would expire on January 20. At a case review on January 17, the parties requested a trial date. The court scheduled trial for February 10, and Mr. Larson agreed to an extension of the *ex parte* order until that date. On January 31, 2023, the court "so ordered" a stipulation in which the parties agreed to a continuance of the PFA hearing from February 10 to March 17 and Mr. Larson agreed to an extension of the *ex parte* order through March 17.

(30) On March 17, 2023, as the matter convened for trial, Mr. Larson's counsel made an oral motion to dismiss. Counsel argued that the court lacked jurisdiction based on statements that Ms. Gibson made during a deposition two days

---

[32] 10 *Del. C.* § 1043.

22

earlier.[33]  Ms. Gibson's counsel requested a continuance so that she could respond to the motion.  After discussion, it was determined that Mr. Larson's counsel would file a written motion later that day and Ms. Gibson's counsel would have seven days to respond.  The court and counsel then discussed when the matter would be rescheduled.  The court offered several trial dates within the following two weeks, but the next date that both counsel and the court were available for the trial was April 26.  Mr. Larson's counsel objected to the extension of the *ex parte* order until the new trial date, asserting that the order interfered with Mr. Larson's employment because his new employer was within 100 yards of both the Firm and Ms. Gibson's residence and the statute did not authorize an extension beyond thirty days.  The court extended the order, stating that (i) the extension was attributable in part to Mr. Larson's new motion, and (ii) it would now be an interim, not *ex parte* order, because the court had heard Mr. Larson's objection to the extension.  When scheduling additional days of trial became necessary, the court extended the order again, over Mr. Larson's objection.

(31)  We cannot conclude that Mr. Larson is entitled to relief based on the extension of the order beyond the thirty-day period set forth in 10 *Del. C.* § 1043(d).  Mr. Larson consented to the initial extensions.  The first extension to which he did not consent was the result of his counsel presenting an oral motion to dismiss at the

---

[33] *See supra* ¶ 9 (discussing motion to dismiss).

23

beginning of the scheduled trial. And the later extensions were attributable to the complexity of the case, which involved testimony from numerous witnesses and required that additional days of trial be scheduled. Moreover, when the court issued the PFA on the merits on June 13, 2023, it ran the two-year duration of the order from March 17, 2023, the end of the period to which Mr. Larson had consented to the extensions. Under these circumstances, we conclude that the court did not impermissibly extend an *ex parte* order beyond the period permitted by statute.[34]

(32) Mr. Larson makes several arguments about "evidentiary issues." First, he contends that Ms. Gibson's testimony at trial revealed that she had not produced in discovery all of her relevant communications with others from the December 16– 18, 2022 period. He asserts that the commissioner should have "take[n] steps to address this non-disclosure of evidence, either through adverse inference, discovery sanction or otherwise." Mr. Larson does not contend that he sought such relief during trial, and we find no error in the commissioner's failure to consider such relief *sua sponte*. Second, Mr. Larson argues that Ms. Gibson "spoliated" evidence by sending only portions of her communications with Mr. Larson to their colleagues in the aftermath of the events in Philadelphia. Mr. Larson used Ms. Gibson's actions as an impeachment tool to suggest that Ms. Gibson was deceitful about the context

---

[34] *See* 10 *Del. C.* § 1043(b) (stating that an *ex parte* protective order is one that is "issued . . . without notice to the respondent").

of the Philadelphia incident. Mr. Larson does not indicate what additional "corrective action" he sought or was warranted—rather, he seems to point to Ms. Gibson's conduct as undermining the commissioner's credibility determinations.[35] We defer to the trial court's conclusions regarding credibility.[36] Third, Mr. Larson contends that Ms. Gibson or her counsel deleted an unspecified recording from an electronic storage device that Ms. Gibson's counsel received from Mr. Larson's counsel and later returned. He asserts that the court should have drawn an adverse inference about the contents of the recording. Mr. Larson challenged Ms. Gibson's credibility but did not seek an adverse inference at trial. Nor does he appear to have asserted—or to assert in this appeal—that he did not retain a copy of the recording. If he retained a copy, no inference about its contents was required.

(33) Mr. Larson also argues that the Family Court judge did not conduct a *de novo* review as required. This claim is without merit. The judge stated in both ROCO Decisions that she applied a *de novo* standard of review, and the decisions make clear that she did. The First ROCO Decision recites a comprehensive list of documents and evidence that the judge reviewed, including the transcripts of the proceedings before the commissioner.[37] That decision also extensively cites and quotes from the transcripts and trial exhibits, including the video evidence. It is clear

---

[35] Opening Brief at 36.
[36] *Shimel v. Shimel*, 210 A.3d 732, 2019 WL 2142066, at *2 (Del. May 14, 2019) (TABLE).
[37] *See* First ROCO Decision, at 3–6 (listing documents and transcripts that the judge reviewed).

that the Family Court carefully considered both the factual record and Mr. Larson's arguments. The Second ROCO Decision recites the additional documents and evidence that the judge considered, including the transcript of the hearing on remand, and states that the judge again reviewed the transcripts and evidence from the previous hearings. The Second ROCO addresses the contents of the additional evidence that was admitted on remand—the recordings that were previously excluded—in detail and in relation to both the evidence presented at the previous hearings and the allegations of the petition. The Family Court applied the proper standard in reviewing the commissioner's order.[38]

(34) Mr. Larson contends that the Family Court erred by upholding the commissioner's finding that Mr. Larson abused Ms. Gibson by coercing her into performing oral sex on December 17, 2022. He argues that Ms. Gibson's petition alleged that Mr. Larson physically forced her to perform oral sex, and Mr. Larson therefore did not have fair notice of the coercion allegation. We disagree. The petition explicitly alleged "coercion" and contained detailed factual allegations that would put a respondent on notice that Ms. Gibson alleged two theories by which a finding of abuse could be made as to the oral sex on December 17, 2022: *either* Mr.

---

[38] *See generally Collins v. Collins*, 243 A.3d 440, 2020 WL 7335417, at *2 (Del. Dec. 11, 2020) (TABLE) (holding that argument that the Family Court "did not conduct a *de novo* review, but simply repeated the Commissioner's findings, which were not supported by the record" was without merit).

Larson physically forced her to perform oral sex *or* he coerced her into performing oral sex by making threats against her job and prospective bar admission.

(35) Finally, Mr. Larson challenges the findings of abuse and asserts that the Family Court erred in finding Ms. Gibson credible. The commissioner assessed the witnesses' credibility and found, by a preponderance of the evidence before the court, that Mr. Larson committed acts of abuse against Ms. Gibson. To the extent that the trial court's determination of facts turned on the credibility of the witnesses at trial, we will not substitute our opinion for that of the fact finder.[39] The Family Court judge reviewed the record *de novo* and concluded that the record supported the commissioner's findings. After careful consideration of the record, we have concluded that the Family Court's findings of fact are sufficiently supported by the record and are not clearly wrong.[40]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice

---

[39] *Shimel*, 2019 WL 2142066, at *2.
[40] *Stuart*, 2017 WL 1090543, at *1.